**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**JAMES PORTER PARKER,**

    **Plaintiff,**

**vs.**                                              **CASE NO. 1:04CV25-MMP/AK**

**STEPHEN OELRICH, et al,**

    **Defendants.**

    _____/

## REPORT AND RECOMMENDATION

Plaintiff brings this cause of action pursuant to 42 U.S.C. §1983 alleging that while he was held at the Alachua County Jail he was denied medical care by the Defendants. (Doc. 12). Defendants have filed their special reports (docs. 79 and 82), which have been construed as motions for summary judgment. (Doc. 83). Plaintiff was advised of his responsibilities to provide evidentiary materials in response to the motion and was allowed time for discovery (docs. 83 and 88), and he has come forward with an affidavit and memorandum of law. (Doc. 90).

**I.     Allegations of the Amended Complaint (Doc. 12)**

Plaintiff alleges that while he was incarcerated at Alachua County Jail he was subjected to unsanitary conditions of confinement that resulted in a highly contagious bacterial infection known as Methicillin Resistant Staphylococcus Aureau [MRSA] that developed and spread throughout the population. (Doc 12, p. 5). Plaintiff claims that

Defendant Oelrich and Baker knew of the infection for several months and did not separate the infected prisoners from general population nor did they take measures to sanitize the jail, which would have controlled the infection.  Plaintiff alleges that he made several requests for medical care, but First Correctional Medical has a policy that requires a three day waiting period for all requests by inmates.  Plaintiff claims that he made his first request for treatment of a wound on his arm on June 24, 2003.  He again submitted a request on June 26, 2003, when swelling spread up his arm and to his testicles.  On June 30, 2003, Plaintiff was finally seen by Dr. Baker.  At this time Plaintiff claims that his arm was twice its normal size and swollen from his hand to his arm pit.  His testicles were the size of grapefruits and he was in extreme pain.  Dr. Baker allegedly told him he had MRSA, a bacterial infection that was going around the jail and he had been unable to segregate prisoners because of security reasons.  Despite Plaintiff's complaints of pain, Dr. Baker refused to give him pain medication and without warning excised his testicles in four places and squeezed blood and pus from them.  Plaintiff claims that Dr. Baker gave him gauze patches and told him to apply pressure and to squeeze his testicles later into the cell pod toilet.  Plaintiff claims that his testicles and arms were oozing highly contagious fluids and he was given no bandages.  He had also bled on his pants which caused him discomfort and humiliation by other inmates when he returned to his pod.  No follow up orders or additional treatment was provided for by Dr. Baker, and Plaintiff had to make another sick call request the next morning, but no orders were left for him and by July 2, 2003, a nurse gave him one ibuprofen, but stated that no orders of any kind had been left by Dr. Baker for him.  Later that day he

**No. 1:04cv25-mmp/ak**

allegedly begged Nurse Tim White for help showing him his bloody arm and swollen testicles (through his pants) and White said he was not down for an appointment, he could not help him.  Later he allegedly declared a medical emergency to Defendant Robinson and Mizell, but they told him he was not in prison yet, he would be seen when they felt like attending to him, they did not care how much pain he was in, and then they allegedly made fun of his swollen testicles with other inmates.  Plaintiff then contacted an attorney and by 3:00 p.m. he was taken to medical.  In the examination room, Major Chapman asked "Shouldn't this man be in a hospital?"  In the infirmary his wounds were cleaned and treated and dressed.  A culture was obtained that Dr. Baker said would be given to the health department adding that perhaps they could take appropriate measures in the jail to stop the infection.  At 6:00 p.m. Plaintiff was taken to the hospital where after ten days of being ignored he was given antibiotics and pain medication.  Plaintiff also claims that he was reinfected when he was returned to Alachua County Jail, which he carried with him to prison on August 28, 2003, when he was finally treated properly.

## II.     Standard of Review

A district court should grant summary judgment when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case."  Nolen v. Boca Raton Community Hospital, Inc., 373 F.3d 1151, 1154 (11th Cr. 2004), *citing* Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986).  All issues of material fact should be resolved in favor of the Plaintiff or non-moving party before the Court determines the legal question of whether the defendant is

**Case No. 1:04cv25-MMP/AK**

entitled to judgment as a matter of law under that version of the facts.  Durruthy v. Pastor, 351 F.3d 1080, 1084 (11th Cir. 2003); Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002).   The Plaintiff has the burden to come forward with evidentiary material demonstrating a genuine issue of fact for trial.  Celotex, 477 U.S. at 322-23.  Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  There must be such evidence that a jury could reasonably return a verdict for the party bearing the burden of proof.  Anderson v. Liberty Lobby, 477 U.S. 242, 251, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986).  "For factual issues to be considered genuine, they must have a real basis in the record."  Mize v. Jefferson City Board of Education, 93 F.3d 739, 742 (11th Cir. 1996).

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "  Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen v. Wille, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

**Case No. 1:04cv25-MMP/AK**

While a moving party is not required to support his motion for summary judgment with affidavits, Celotex, supra at 323, the facts stated in uncontradicted affidavits or other evidentiary materials must be accepted as true for purposes of summary judgment. Gauck v. Meleski, 346 F.2d 433, 436 (5th Cir. 1965).

### III.  Defendants' [OELRICH, ROBINSON AND MIZELL] Rule 56(e) evidence

   a)  Jail Medical Records (Doc. 79, Exhibit 1)

In an Intake Summary completed when Plaintiff arrived at the Alachua County Jail he was noted to have "skin problems" and prescriptions for Prednisone, Keflex and others. (Exhibit 1-A). He refused a genital and rectal exam. (Exhibit 1-B). In an Request Form completed on June 26, 2003, Plaintiff stated that when he arrived at the jail he was being treated by DOC for a staph infection, which had returned, and he requested treatment ASAP because it was highly contagious. (Exhibit 1-C). He was placed on sick call for June 27, 2003. On June 26, 2003, he requested medical attention stating that the staph infection was spreading. The response was dated June 28, 2003, and said that the request had not been received until June 28, 2003, he was signed up for medical on June 28, 2003, and had he been seen by medical? (Exhibit 1-E). At the bottom of the request is Plaintiff's note that he contracted the staph infection from unclean surroundings, therefore he believed he should be exempt from the medical co-pay. Another request dated July 1, 2003, says he had surgery on June 30, 2003, and was in great pain. The response says that he was seen on July 2, 2003, and was presently in the infirmary. Other Inmate requests by Plaintiff refer to a skin condition he had at DOC and his requests concern a return of medicine, shampoo or

**Case No. 1:04cv25-MMP/AK**

soap, that was confiscated upon his arrival which he contends will help with his skin problems. (Exhibit-1-E). The requests are responded to affirmatively and within a day of the request. (Exhibit 1-E).

Physicians Orders show that Plaintiff was given refills of all the medications that he brought with him to the jail, and of particular interest is the notation dated June 30, 2003, that shows a number of prescriptions, including Septra, an antibiotic, and Motrin, a mild pain reliever. (Exhibit 1-F). On July 2, 2003, dressing changes were ordered as was a narcotic pain killer, Darvocet N100, then he was ordered to the infirmary, and on the ER on July 3, 2003. Cultures were taken at this time and sent to the lab. He was readmitted to the infirmary on July 8, 2003, post hospitalization for "staph infection" and additional medications were ordered, including antibiotics.

The first medical entry for staph infection and swollen testicles is dated June 30, 2003. (Exhibit 1-G). The entry includes a Betadine application over the testicles, xylocaine (an anesthetic), and dressing changes for the small incisions made to relieve the pus filled areas. The first entry about his arm appears on July 1, 2003, and it was examined and found to be red and slightly swollen. It was noted that he was already on antibiotics. Another examination of his scrotum was done on July 2, 2003, and after applying a 1% solution of xylocaine (an anesthetic) to the area, more fluid was drained and additional dressing applied. He was admitted to the infirmary and multiple dressing changes were made, and he was given a red bio-hazard bag to dispose of the used gauze when he said that he would change the dressings himself after he showered. On

**Case No. 1:04cv25-MMP/AK**

July 14, 2003, the wounds were examined and found to be healed, and it was discussed that there was no further reason to keep him isolated from general population.

Emergency room records dated July 3, 2003, show that he entered with multiple areas of MRSA staph infection which had been unresponsive to antibiotic treatment. (Exhibit 1-H). The admitting notation references the infection as likely coming from "carbuncles" and skin contact with an initiating source. The notations also state that he got the infection from prison prior to coming to the jail. The infection spread apparently from scratching the carbuncles and Plaintiff was told to trim his nails, take frequent baths, and not to scratch his scrotum.

Plaintiff left the jail and was returned to Holmes CI on August 28, 2003. (Exhibit 1-M). A note written by Dr. Baker on August 28, 2003, indicates that he called Holmes CI to advise that Plaintiff had an infection at the jail similar to one he reported having at Holmes CI. (Exhibit 1-D). Plaintiff returned to the jail on September 12, 2003, when it was noted upon intake that he had no further infection problems. (Exhibit 1-M).

  b) <u>Affidavit of Robert E. Chapman (Exhibit 1- ).</u>

Major Chapman is Director of Alachua County Jail and is familiar with Plaintiff and the medical problems he had in 2003. When he was first notified of Plaintiff's condition on July 2, 2003, he immediately ordered him to the infirmary and then on to the emergency room. During this time no other cases of the infection were reported, the Health Department investigated and found no reason for the jail to take any additional actions, and that if there had been an epidemic Chapman would have been the party

**Case No. 1:04cv25-MMP/AK**

notified and the one to take action. To his knowledge there had never been a problem with unsanitary conditions in the jail.

    c)    <u>Jail Policy and Procedures (Exhibit 2)</u>

The jail had a number of procedures in place for keeping the jail clean and sanitary including providing cleaning supplies to the inmates themselves and monitoring that the living areas were kept clean.

    d)    <u>Affidavit of Karen Keith (Exhibit 3)</u>

Ms. Keith reviewed Plaintiff's grievance file and he never filed grievances on the issues of unsanitary conditions or denial of medical care. He filed requests about medical care, but these were not considered grievances.

**IV.**    **Defendants' [First Correctional Medical and Dr. Larry Baker] Evidence**

    a)    <u>Jail Medical Records (Exhibit A)</u>

        <u>See</u> supra.

    b)    <u>Affidavit of Defendant Larry Baker (Exhibit B)</u>

Dr. Baker attests that Plaintiff was transferred to the jail on May 8, 2003, and came in with a staph infection for which he was receiving antibiotics. Antibiotics were continued at the jail and it was assumed that the condition resolved. Dr. Baker saw Plaintiff in May 18, 2003, for hypertension and no mention of the infection was made nor was it noted upon examination at that time. On June 26, 2003, an inmate request form was completed by Plaintiff indicating that he believed the infection had returned. He was placed on sick call and per jail and medical policy unless the inmate declares a medical emergency he will be seen within 24 hours. The response by nursing was that

**Case No. 1:04cv25-MMP/AK**

he should report for sick call on June 28, 2003. No entry indicates that he was seen on that date, but on June 30, 2003, he reported with complaints of a staph infection and swollen testicles. Dr. Baker saw him on that date and after applying an anesthetic he made an incision and drained fluid from an area on his scrotum. It is always Dr. Baker's practice to discuss treatment with the patients and he would never have performed this procedure without Plaintiff's agreement. The area was cleaned, a bandage was applied, and antibiotics and a pain reliever prescribed. On July 1, 2003, Plaintiff reported increased swelling in the area and he was placed on the list for MD clinic, and on July 2, 2003, he reported to the clinic that he had an area on his left arm that was swelling and that he had used a razor to cut his own testicle to drain pus. He was given a stronger pain reliever, Darvocet, and continued on antibiotics. The nursing staff was given instructions to assist with dressing changes. Plaintiff was admitted to the infirmary and on July 3, 2003, Dr. Baker ordered that he be sent to the hospital and cultures taken and sent to the lab. It was Dr. Baker's intent that IV antibiotics would be administered and might prove more effective. IV antibiotics could not be administered at the jail. Plaintiff was returned to the jail on July 8, 2003, where he stayed on oral antibiotics until his transfer back to DOC.

    c)    <u>Affidavit of Karen Dunbar Johnson (Exhibit C)</u>

Ms. Johnson is Director of Nursing at the jail and recalls Plaintiff and his medical problems. She described the procedures and policy set forth by her employer, First Correctional Medical, which provided for health care request slips to be available at all housing areas, and which were collected throughout the day and reviewed by health

**Case No. 1:04cv25-MMP/AK**

care staff on each shift. Clinical care of a non-emergency nature outside the jail are scheduled within a week of the request. Sick call referrals to a physician are scheduled within three days of the request or as clinically indicated and physician clinics are held five days a week. Records show that Plaintiff filed a request form on June 26, 2003, about the recurring staph infection and on June 27, 2003, he was scheduled for sick call. Another form dated June 26, 2003, which staff received on June 29, 2003, indicates that he had been scheduled for sick call on June 28, 2003. Treatment notes indicate that Dr. Baker saw him on June 30, 2003, and antibiotics and pain medications were given to him on this date through July 3, 2003, when he was transferred to the hospital at North Florida Regional Medical Center. When he returned from the hospital he was kept at the infirmary and offered no complaints. He was returned to DOC and did not indicate on that date, August 28, 2003, that he had any problems other than hypertension.

      d)     <u>Affidavit of Sue Cianciolo (Exhibit D)</u>

Ms. Cianciolo is the Administrative Assistant to the President/CEO of First Correctional Medical and she has reviewed their files and finds no record of any intent t to sue FCM. She has also attached the policy and procedures of FCM regarding medical treatment which corroborates the affidavit of Ms. Johnson. Additionally, the policy explains that a nursing staff evaluates all sick calls, conducts triage, and suggests treatment within their licensure, but refers all problems beyond their scope to the appropriate provider. Through triage, referrals are prioritized and scheduled for

**Case No. 1:04cv25-MMP/AK**

physician review and follow up accordingly. "Physician referrals are to be scheduled within three days of the request or as clinically indicated."

## V. Plaintiff's Rule 56(e) evidence

a) Plaintiff's affidavit

Plaintiff contends that the medical records provided by the Defendants are inaccurate and that "a visual inspection of these documents will show that the same individual made notations in the same pen well after the time of occurrence." Plaintiff insists that if he had been allowed to depose witnesses these inaccuracies would have been shown, but he could not afford to depose witnesses and must rely upon the facts in the medical records which establish that he had a bacterial infection caused by unsanitary conditions and suffered from a delay in treatment. He contends that Defendant Baker performed unauthorized surgery upon him and any notation that he received medication and bandages is perjury. Plaintiff also complains that he was unable to obtain affidavits from other officers, particularly Defendants Robinson and Mizell.

## IV. Analysis

Medical claims under the Eighth Amendment have an objective and subjective component, each of which additionally is considered to encompass two subsidiary requirements. Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000), cert. denied, 531 U.S. 1077, 121 S.Ct. 774, 147 L.Ed.2d 673 (2001). The "objective component" of the Eighth Amendment standard requires a determination whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. See Wilson v.

**Case No. 1:04cv25-MMP/AK**

Seiter, 501 U.S. 294, 303, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271 (1991).  This objective component varies with the situation and the conduct in question and is responsive to "contemporary standards of decency."  Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976); see also Rhodes v. Chapman, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981).  An objectively serious deprivation requires (1) showing an objectively "serious medical need." Estelle, 429 U.S. at 104.  A serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm." Farrow v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994).  In addition, an objectively serious deprivation requires (2) showing the response made by the defendant to that need was so deficient as to constitute "an unnecessary and wanton infliction of pain" and not simply "negligen[ce] in diagnosi[s] or treat[ment]," or even "[m]edical malpractice" actionable under state law. Estelle, 429 U.S. at 105-06 (internal quotation marks omitted).  See Taylor, 221 F.3d at 1257; see also Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003).

A serious medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Farrow, at 1243, quoting Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1187 (11th Cir. 1994).

To show the required subjective intent to punish the plaintiff must demonstrate that the defendant acted with an attitude of "deliberate indifference." Estelle, 429 U.S. at 105.  This is defined as requiring (1) an "aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists" and (2) the actual

**Case No. 1:04cv25-MMP/AK**

"draw[ing of] the inference." Farmer, 511 U.S. at 837. In sum, in a claim of denial of medical attention under the Eighth Amendment "[u]ltimately, there are [] four requirements: an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." Taylor, 221 F.3d at 1258.

     As to the deliberate indifference claims asserted against Defendants Dr. Larry Baker, Tim White, Officers Robinson and Mizell, the undersigned finds that the evidentiary materials submitted with the motion for summary judgment clearly refute Plaintiff's version of what happened to him, and although Plaintiff was advised of the need for evidentiary materials to support the facts alleged in his complaint, he has come forward with nothing. The undersigned does not accept Plaintiff's allegations that the records submitted by the Defendants are untrue. To believe this, the Court must accept that a conspiracy existed between the jail staff, many of whom are not defendants in this lawsuit, hospital staff at North Florida Regional Medical Center, the Health Department and DOC. The recurring thread throughout these records was that Plaintiff reported upon intake at the jail and upon transfer to the hospital that he had a staph infection at DOC that recurred after he had been at the jail. The hospital, not any of the Defendants at the jail, attributed the infection to carbuncles that Plaintiff had scratched, not unsanitary conditions at the jail. Major Chapman attests that no other inmate was affected with the infection although Plaintiff claims that it was an epidemic spread throughout the population. Plaintiff could have sought affidavits from these many inmates suffering from this infection to support his allegations, but he has provided the

**Case No. 1:04cv25-MMP/AK**

Court with no names of others, which the Court could have helped him to obtain information from if they were still incarcerated. It is significant to note that Plaintiff is not incarcerated. That is, he was free to engage in significant factual development if he wanted, unlike incarcerated persons who bring lawsuits in this Court. Plaintiff has been free world since at least April 2005. (See Doc. 52). A number of factual issues were set forth in the many affidavits submitted with the two motions for summary judgment, none of which were addressed in Plaintiff's unsworn affidavit. It is not sufficient to simply claim that the Defendants' records are wrong without coming forward with some affirmative support or otherwise the facts stated in uncontradicted affidavits or other evidentiary materials must be accepted as true for purposes of summary judgment. Gauck v. Meleski, 346 F.2d 433, 436 (5th Cir. 1965). Taking the facts as set forth in the affidavits and supporting materials, Plaintiff arrived at the jail taking antibiotics which he had received at Holmes CI, which were continued. At an examination for other problems by Dr. Baker in May 2003, Plaintiff did not complain of a staph infection. In late June he did develop symptoms which he complained about in a request form dated June 26, 2003, which resulted in his being scheduled for examination by Dr. Baker on June 30, 2003. At that time an excision of some areas on his scrotum was undertaken after topical anesthesia and after which he was bandaged and given pain medication and more antibiotics. When the infection was not clearing up by July 2, 2003, he was seen again and Dr. Baker determined that more aggressive antibiotic treatment was necessary and could not be administered at the jail so he was transferred to the hospital where he stayed for several days. Laboratory cultures confirmed the infection to be

**Case No. 1:04cv25-MMP/AK**

MSRA, and jail personnel asked the health department to determine if any additional measures should be taken, and it was determined that it was unnecessary to do so.  No one else was affected with the infection, but Plaintiff remained isolated at the infirmary until July 14, 2003, when no outward signs of infection were noted.  He remained on antibiotic however until he was transferred to DOC custody in August and his transfer intake noted no problems with infection at that time.  There is nothing in these facts to support deliberate indifference by any of the Defendants.

Further, at the time Plaintiff claims in his complaint that Defendants White, Mizell and Robinson were ignoring his medical condition and pleas for help (July 2, 2003), other medical records show that he was in the infirmary and transferred to the hospital the next day.  While some delay is unexplained from June 26, 2003, when Plaintiff requested medical attention and June 30, 2003, when he was examined by Dr. Baker, there is other evidence that his request was screened by a nurse and he was scheduled for the medical clinic on June 28, 2003, but something happened that delayed his examination an additional two days.  However, there is nothing apparently deliberate about this additional delay and Plaintiff has not adequately identified who was responsible for this delay nor do the records explain this.

Finally, Plaintiff has alleged that Sheriff Oelrich, Alachua County and FCM has a policy that all inmates regardless of their medical condition must wait three days for treatment.  The law is well settled that there can be no governmental liability against FCM, Alachua County/Mike Byerly or Sheriff Oelrich, as policymaker for the jail, unless Plaintiff identifies a custom or policy of deliberate indifference.  See Monell v.

**Case No. 1:04cv25-MMP/AK**

Department of Social Services, 436 U.S. 658 (1978); McDowell v. Brown, 392 F.3d 1283 (11th Cir. 2004). However, the uncontroverted affidavits and the policies and procedures submitted show that this was not the written policy of FCM, which provided medical care on behalf of the county and the sheriff. The medical records of Plaintiff's own treatment belie this also. Besides the unexplained delay from June 26, 2003, to June 30, 2003, before Dr. Baker examined and treated him for the staph infection, all other requests were attended to within 24 hours or less. Thus, there is no factual basis for Plaintiff's claim regarding a policy of indifference.

Plaintiff had to be aware that the facts he presented in his complaint were untrue. He knew that he had a staph infection before he came into the jail, he knew that it was not an epidemic, he knew that he was taking antibiotics and pain killers prescribed by Dr. Baker, he knew that he was given gauze and bandages after his testicles were excised, and he knew that he was transferred to the hospital and treated as soon as his situation worsened a few days after Dr. Baker first examined him. Because he knew the grounds for this lawsuit were false, his intent in bringing it are herein deemed frivolous and malicious, and he should at the very least be given a strike.

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendants' motions (docs. 79 and 82) be **GRANTED**, and Plaintiff's amended complaint (doc. 12) be **DISMISSED** for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2). In addition to recommending that this case be dismissed, it is also recommended that the order adopting this report and recommendation direct the clerk of court to note on the docket that this cause was dismissed pursuant to 28 U.S.C.

**Case No. 1:04cv25-MMP/AK**

§ 1915(e)(2)(B)(I) as frivolous and malicious also and that this dismissal constitutes a "strike" within the meaning of 28 U.S.C. § (g).

**IN CHAMBERS** at Gainesville, Florida, this **6**<sup>th</sup> day of September, 2006.

s/ A. KORNBLUM
**ALLAN KORNBLUM
UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

**Case No. 1:04cv25-MMP/AK**